1

2

3

4

5

6                      UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
7                              AT SEATTLE

8   INLAND NORTHWEST RENAL CARE
    GROUP, LLC, d/b/a NORTHPOINTE
9   DIALYSIS,                                    CASE NO. C19-1758-JCC-MAT

10                          Plaintiff,
                                                 REPORT AND RECOMMENDATION
11          v.

12  WEBTPA EMPLOYER SERVICES, LLC,
    and FIRST CHOICE HEALTH NETWORK,
13  INC.,

14                          Defendants.

15

16                              INTRODUCTION

17          Plaintiff Inland Northwest Renal Care Group, LLC, d/b/a Northpointe Dialysis

18  ("Northwest") raises contractual and quasicontractual claims against defendants WebTPA

19  Employer Services LLC ("WebTPA"), and First Choice Health Network, Inc. ("First Choice") in

20  its First Amended Complaint.  (Dkt. 22.)  WebTPA filed a Motion to Dismiss the Amended

21  Complaint, seeking dismissal of all claims asserted against it in the complaint.  (Dkt. 25

22  (addressing Counts I, II, IV, V, VI, and VII).)  Plaintiff opposes the motion, moves to strike certain

23  documents and references and arguments based on those documents, and requests oral argument.

REPORT AND RECOMMENDATION
PAGE - 1

1   (Dkt. 33; *see also* Dkt. 38.)  The undersigned, having considered the briefing and evidence properly

2   considered in support, finds oral argument unnecessary and concludes the motion to strike should

3   be GRANTED and the motion to dismiss should be DENIED.

BACKGROUND

5       Plaintiff Northwest is a healthcare provider and provided outpatient renal dialysis and

6   related services to a patient referred to in the First Amended Complaint and hereinafter as "Patient

7   X." (Dkt. 22, ¶1.1.)  Defendant WebTPA provides administrative services for group health plans,

8   including the health plan of which Patient X is a member, and adjudicates healthcare providers'

9   claims for payment.  Defendant First Choice operates a healthcare preferred provider organization

10  (PPO) network (the "Network") and contracts with both healthcare providers, such as Northwest,

11  and third party administrators for healthcare services, or "payors", such as WebTPA.  (*Id*., ¶4.2.)

12  Through such contracting, customers of payors receive access to the services of providers in the

13  Network.  In this suit, Northwest alleges defendants' refusal to pay Northwest at contractually

14  agreed-upon rates for dialysis services provided to Patient X.

15      WebTPA entered into a contract with First Choice – the First Choice Health PPO Network,

16  Inc. Contract Holder Agreement ("Payor Contract") – effective May 1, 2009.  (*Id*., ¶4.17; Dkt. 26,

17  Ex. A.)  Northwest entered into the First Choice Health Network Healthcare Facility Agreement

18  (the "Provider Contract") with First Choice on June 1, 2011, and as later amended, and became a

19  participating "Network Provider."  (Dkt. 22, ¶4.5; Dkt. 35, Ex. A.)

20      The Provider Contract obligates Northwest to provide renal dialysis services to any patient

21  covered by a health plan offered or administered by a payor contracted to participate in the

22  Network, "i.e., a Network Patient."  (Dkt. 22, ¶4.6; Dkt. 35, Ex A, ¶¶2.1, 3.9.)  Northwest must

23  provide those services at specified facilities, including Northpointe Dialysis Unit in Spokane,

REPORT AND RECOMMENDATION
PAGE - 2

Washington.  (Dkt. 22, ¶4.7; Dkt. 35, Ex. A, ¶2.1, Sched. C.)  Treatment must be provided to Network Patients presenting insurance identification (ID) cards containing the First Choice logo or otherwise where the payor is listed as a Network Payor on the First Choice website.  (Dkt. 22, ¶4.8; Dkt. 35, Ex. A, ¶¶2.1, 3.9.)

First Choice "shall require all Payors" to pay Northwest for covered services rendered to Network Patients pursuant to Schedule B of the Provider Contract.  (Dkt. 22, ¶4.10; Dkt. 35, Ex. A, ¶¶3.1, 4.2.)  Schedule B specifies that "reimbursement for Outpatient Dialysis and Related Services shall be [at the Network Rate of] eighty percent (80%) of [First Choice's] full-billed charges." (Dkt. 22, ¶4.11; Dkt. 35, Schedule B.)  First Choice "has the contractual ability to bind the Payors to the terms of [the Provider Contract] (as applicable thereto) and to cause them to be responsible for their resulting obligations hereunder."  (Dkt. 22, ¶4.12; Dkt. 35, Ex. A, ¶4.2.)  First Choice must ensure payors produce an Explanation of Benefits (EOB) during the claim adjudication process, "which must, at a minimum, identify:  [First Choice], total billed charges, [and the] allowed amount in accordance with [Network] fee schedules, amount Payor responsible to pay, amount Participant responsible to pay, and explanation for non-payment[.]'"  (Dkt. 22, ¶4.13; Dkt. 35, Ex. A, ¶3.11.)

Northwest, in turn, must accept payment as provided for in Schedule B and may not bill or collect from Network Patients any portion of its charges or any portion of the Network Rates for covered services, with the exception of deductibles, co-payments, and co-insurance, even in the event of "non-payment by Payor" or breach of the contract.  (Dkt. 22, ¶4.14; Dkt. 35, Ex. A, ¶2.8.1.)  If not paid by a payor, First Choice must assist Northwest in enforcing the Provider Contract "as applicable to particular Payors by virtue of any applicable agreement between [First Choice] (or an affiliate)" and the delinquent payor, and collecting any payments owed.  (Dkt. 22,

REPORT AND RECOMMENDATION
PAGE - 3

1    ¶4.15; Dkt. 35, Ex. A, ¶4.2.)  Where informal efforts at dispute resolution fail, either party may

2    pursue a judicial remedy.  (Dkt. 22, ¶4.16; Dkt. 35, Ex. A, ¶9.2.)

3    WebTPA is a Network Payor.  (Dkt. 22, ¶¶4.9, 4.18-4.19.)  Under the Payor Contract,

4    WebTPA "desires to secure the cost savings and other benefits of [First Choice's] Provider

5    Agreements for the benefit of its Payors, Benefit Plans and Benefit Plan Participants."  (Dkt. 26,

6    Ex. A (Payor Contract, without referenced exhibits), Recital B).)  WebTPA must comply with "all

7    terms and conditions" of the "Provider Agreement" attached as exhibits to the contract, and defined

8    as the Health Care Facility Agreement and Preferred Provider/Group Agreement.  (*Id*., ¶¶1.16,

9    2.6.)  Compliance includes processing claims and producing an EOB "in accordance with [First

10   Choice] Provider fee schedules" and hospital rates for services covered under a benefit plan, and

11   including the same minimum requirements described above.  (*Id*., ¶2.6.1.)  "All charges for

12   services provided to Participants by [First Choice] Participating Providers under the terms of any

13   Benefit Plan shall be in accordance with [First Choice] provider fee schedules and hospital rates."

14   (*Id*., ¶3.4.)  WebTPA must also issue ID cards compliant with specifications set by First Choice,

15   including the First Choice name and/or logo.  (*Id*., ¶¶2.7.1, 3.7.)

16   Patient X, a Network Patient, sought to arrange outpatient renal dialysis treatment and

17   related services beginning in or around September 2017.  The ID card Patient X presented to

18   Northwest included the First Choice logo.  (Dkt. 22, ¶4.38; Dkt. 35, Ex. B.)  Northwest avers the

19   ID card "did not include any specialty exclusions that would have impacted Northwest, a First

20   Choice Provider."  (Dkt. 22, ¶4.38.)  Northwest further avers that, on or about September 13, 2017,

21   Northwest contacted WebTPA regarding Patient X's insurance coverage and a WebTPA

22   representative "named Patty B confirmed that Northwest was 'in-network' with WebTPA and that

23   services Northwest provided to Patient X would be reimbursed at the Network Rates."  (*Id*., ¶4.39.)

REPORT AND RECOMMENDATION
PAGE - 4

Northwest proceeded to treat Patient X and continues to provide treatment to date.

Northwest allege that, while administering the claims for payment submitted by Northwest, WebTPA provided reimbursement at rates "substantially below the Network Rates, and often as low as 7%" of those rates and did not issue compliant EOBs. (*Id.*, ¶¶4.44-4.45.) Northwest sent letters notifying WebTPA of underpayment for services provided to Patient X and demanding reimbursement at the Network Rate. In April 2018, WebTPA sent Northwest a letter indicating a delay in response due to the need for additional information and that an additional response would follow. Northwest did not receive a further response or funds meeting the Network Rates.

In a September 10, 2019 letter, Northwest notified First Choice of WebTPA's refusal to pay Northwest at Network Rates for services provided to Patient X. Northwest requested First Choice comply with its contractual obligations and require WebTPA to pay Northwest at the Network Rate; ensure WebTPA produces an EOB reflecting an allowed amount in accordance with First Choice fee schedules; and assist Northwest in enforcing WebTPA's obligations under the Payor and Provider Contracts and in collecting payments owed by WebTPA. (*Id.*, ¶4.49.) Northwest alleges First Choice has neither required reimbursement by WebTPA, nor otherwise complied with its contractual obligations. Northwest attests to sustaining damages of some $1.5 million and continuing to accrue.

The First Amended Complaint clarifies that Northwest is "not suing under ERISA to recover benefits under Patient X's health plan, but solely based on the independent contractual and other legal duties owed by defendants WebTPA and First Choice[.]" (*Id.*, ¶1.6 (emphasis in original).) It notes all of Patient X's claims have been adjudicated and paid, albeit not at Network Rates, meaning WebTPA determined the services provided are covered under Patient X's health plan. (*Id.*) Northwest avers that, "upon information and belief, neither First Choice nor WebTPA

REPORT AND RECOMMENDATION
PAGE - 5

1    provided Patient X's health plan to Northwest prior to Northwest commencing treatment[.]"  (*Id*.)

2         WebTPA denies any contract with Northwest or anything in its contract with First Choice

3    binding it to Northwest.  It depicts its sole responsibility as processing claims pursuant to the terms

4    of a group health plan's schedule of benefits.  That is, pursuant to the Payor Contract, participants

5    in benefit plans administered by WebTPA receive access to the First Choice Network's

6    participating providers, who "will act as independent contractors to render services to Participants

7    pursuant to [WebTPA] Benefit Plans and the Provider Agreement."  (Dkt. 26, Ex. A, ¶3.1.)

8         With respect to Patient X, WebTPA states it must process claims in accordance with the

9    terms of the Spokane Tribe of Indians Buy-Up Plan ("Spokane Plan") and its provisions detailing

10   payments that will be made on the behalf of participants for medical services and precluding

11   benefits in excess of maximum amounts or other listed limits.  (*See* Dkt. 25 at 3-4.)  Pointing to an

12   Administrative Services Agreement ("ASA") between WebTPA and the Spokane Tribe of Indians

13   ("Spokane Tribe"), WebTPA argues it is not responsible for any of the Spokane Plan's liabilities

14   and obligations, including the payment of claims, merely provides reimbursement services, and

15   does not assume any financial risk or obligation with respect to benefit claims.  (*See id*. at 4.)[1]

16        WebTPA argues that, as reflected on the ID card, Patient X had restrictions in coverage.

17   That is, the Spokane Plan, in covering tribal members and other individuals eligible under federal

18   law to receive healthcare services from the Indian Health Service ("IHS") or a tribal health

19   program, provides for payment at "Medicare-Like Rates."  (Dkt. 25 at 4-5 (citing 42 C.F.R. §

20   136.30 and 42 C.F.R. § 489.29(a), Section 506 of the Medicare Prescription Drug, Improvement,

21

22        [1] The parties agree the Payor Contract, Provider Contract, and Patient X's ID card (Dkt. 26, Ex. A
     and Dkt. 35, Exs. A & B) are incorporated by reference into the complaint and therefore properly
23   considered.  They dispute whether the Court may consider the Spokane Plan or the ASA in relation to the
     pending motion, as discussed below.

REPORT AND RECOMMENDATION
PAGE - 6

1  and Modernization Act of 2003 and its implementing regulations).)  WebTPA points to two

2  "disclaimers" on Patient X's ID card, including: (1) "American Indian and Alaska Native members

3  may have Medicare Like Rates applied"; and (2) "This card is not a guarantee of benefits."  (Dkt.

4  26, Ex. D; Dkt. 35, Ex. B.)

5  DISCUSSION

6       Plaintiff raises five counts against WebTPA, including breach of contract, a third party

7  beneficiary claim, breach of the implied covenant of good faith and fair dealing, promissory

8  estoppel, and implied-in-fact contract, as well as a claim for a declaratory judgment.  WebTPA

9  seeks dismissal of these claims and the Court's consideration of four documents incorporated by

10  reference in the complaint.  Plaintiff opposes the motion to dismiss and moves to strike two of the

11  documents provided by WebTPA and all arguments and references thereto.

12  A.    <u>Standard of Review</u>

13       Defendant seeks dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to

14  state a claim upon which relief can be granted.  In considering a Rule 12(b)(6) motion, the Court

15  must determine whether the complaint alleges factual allegations stating a claim for relief that is

16  "'plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.*

17  *v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads

18  factual content that allows the court to draw the reasonable inference that the defendant is liable

19  for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  While detailed factual

20  allegations are not necessary, a complaint must offer "more than labels and conclusions" and

21  contain more than a "formulaic recitation of the elements of a cause of action[.]"  *Twombly*, 550

22  U.S. at 555.  Dismissal is appropriate if the complaint fails to state a cognizable legal theory or

23  fails to provide sufficient facts to support a claim.  *Shroyer v. New Cingular Wireless Servs., Inc.*,

1    622 F.3d 1035, 1041 (9th Cir 2010).  In considering the motion to dismiss, "[a]ll well-pleaded

2    allegations of material fact in the complaint are accepted as true and are construed in the light most

3    favorable to the non-moving party."  *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th

4    Cir. 2013) (cited source omitted).

5    B.    Motion to Strike

6        As a general matter, the Court may not consider material beyond the complaint in ruling

7    on a Rule 12(b)(6) motion.  *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001).[2]  Exceptions to

8    this rule include material properly submitted as a part of the complaint, documents not physically

9    attached to the pleading if the contents are alleged in the complaint and no party questions the

10   authenticity, and, under Federal Rule of Evidence 201, taking judicial notice of "'matters of public

11   record.'"  *Id.* at 688-89 (quoting *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.

12   1986)).  A document not attached to the complaint may be "incorporated by reference" if the

13   complaint "refers extensively to the document or the document forms the basis of the plaintiff's

14   claim."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

15       WebTPA contends the First Amended Complaint incorporates by reference both the ASA

16   and the Spokane Plan.  (*See* Dkt. 26, Exs. B & C.)  It points to the complaint's references to Patient

17   X's participation in a group health plan administered by WebTPA.  (*See* Dkt. 22, ¶¶1.1, 4.35.)

18       The doctrine of incorporation-by-reference treats documents outside the complaint as

19   though they are part of the complaint itself.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988,

20   1002 (9th Cir. 2018).  It prevents a plaintiff "from surviving a Rule 12(b)(6) motion by deliberately

21   omitting references to documents upon which their claims are based[.]"  *Parrino v. FHP, Inc.*, 146

22

23       [2] Where matters outside the pleadings are presented and not excluded by the Court, the motion
     must be treated as one for summary judgment and disposed of under Rule 56.  Fed. R. Civ. P. 12(d).

REPORT AND RECOMMENDATION
PAGE - 8

F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as recognized in Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681-82 (9th Cir. 2006).  *Accord Khoja*, 899 F.3d at 1002 ("The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken — or doom — their claims.").

A document is incorporated by reference where "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint."  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  For a defendant asserting incorporation by reference, it is not enough to rely on the mere mention of the existence of a document.  *Khoja*, 899 F.3d at 1002.  Nor does a document necessarily form the basis of a complaint where it merely creates a defense to well-pled allegations. *Id.*  Allowing a defendant to utilize the doctrine "to insert their own version of events into the complaint to defeat otherwise cognizable claims[]" would convert a motion to dismiss into a motion for summary judgment, without providing a plaintiff the opportunity to respond to the new version of facts presented by a defendant.  *Id.* at 1002-03 (without the opportunity to respond "defendant's newly-expanded version of the complaint — accepted as true at the pleading stage — can easily topple otherwise cognizable claims."; "[T]he doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim.")

The First Amended Complaint does not mention the ASA or Spokane Plan; it references only Patient X's membership in a health plan administered by WebTPA.  (Dkt. 22, ¶¶1.1 ("WebTPA administers the health plan of which Patient X is a member[.]"), 4.35 ("Patient X is insured by a health plan administered by WebTPA[.]"))  The complaint does not incorporate the ASA by reference by merely mentioning such administration.  Nor do plaintiff's claims depend on

1   the content of that document.  Indeed, had WebTPA not provided it, the existence of the ASA

2   would not be apparent from the complaint.  Also, while relevant and its existence generally

3   referenced, it is not clear plaintiff's claims are dependent on the content of the Spokane Plan.

4   Plaintiff does not seek reimbursement under that plan (*see* Dkt. 22, ¶1.16) or otherwise from the

5   Spokane Tribe.  *Cf. Parrino*, 146 F.3d at 706 (district court properly considered documents

6   attached to a motion to dismiss a lawsuit challenging a denial of health insurance benefits where

7   documents described the terms of health plan, plaintiff alleged membership in plan, his claims

8   rested on his membership in plan and its terms, and plaintiff never disputed their authenticity).

9        Moreover, and as conceded by WebTPA, both the ASA and Spokane Plan are presented in

10   support of a defense to plaintiff's claim for promissory estoppel.  (Dkt. 36 at 14-15 & n.2.) These

11   documents are not properly considered as part of a defense to plaintiff's well-pled allegations.  *See,*

12   *e.g., In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 995-96 (S.D. Cal. 2005) (declining

13   to incorporate numerous exhibits in SEC action where the complaint did not mention or rely on

14   them, but the defendants instead "offer[ed] the documents as evidence that Defendants did not

15   commit a securities violation").  For this reason, and for the reasons stated above, the undersigned

16   does not herein consider either document and recommends granting plaintiff's motion to strike.

17   C.    Motion to Dismiss

18        1.    Breach of Network Agreement (Count I):

19        Plaintiff avers the salient provisions of the Payor Contract and Provider Contract together

20   comprise a "Network Agreement" that is a valid and enforceable contract between Northwest, First

21   Choice, and WebTPA.  Plaintiff alleges the WebTPA Payor Contract incorporates by reference the

22   Network Provider agreements, including the Northwest Provider Contract, with sample Network

23   Provider agreements attached as exhibits.  (Dkt. 22, ¶¶4.34, 5.1, 5.3, 5.10.)  Plaintiff also alleges

REPORT AND RECOMMENDATION
PAGE - 10

WebTPA insurance representative "Patty B" confirmed services provided to Patient X would be reimbursed at Network Rates, or eighty percent of Northwest's billed charges.  (*See id.*, ¶¶4.11, 4.39, 8.6, 9.8 and Dkt. 35, Schedule B.)

In Washington, to prevail on a breach of contract claim, plaintiff must establish the existence of a valid contract, breach of that contract, and resulting damage.  *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995).  A valid contract requires mutual assent, offer, acceptance, and consideration.  *In re Marriage of Obaidi*, 154 Wn. App. 609, 616, 226 P.3d 787 (2010).  There must be a meeting of the minds on essential terms.  *Id.*; *Pacific Cascade Corp. v. Nimmer*, 25 Wash. App. 552, 555-56, 608 P.2d 266 (1980) ("It is essential to the formation of a contract that the parties manifest to each other their mutual assent to the same bargain at the same time.  Mutual assent generally takes the form of an offer and an acceptance.")

WebTPA asserts the absence of any allegation it mutually assented to be bound to a contract with Northwest, or any allegations of an offer, acceptance, or consideration.  It moves for dismissal based on the failure to plausibly allege the elements required for contract formation.  *Oliver v. Ocwen Loan Servs., LLC*, C12-5374-BHS, 2012 U.S. Dist. LEXIS 151671 at *7-8 (W.D. Wash. Oct. 22, 2012) (dismissing based on failure to allege agreement between parties).

WebTPA depicts the alleged Network Agreement as a quintessential mere legal conclusion insufficient to sustain a claim under *Twombly*, 550 U.S. at 564-65.  WebTPA posits that the complaint specifically acknowledges and that documents show Northwest and WebTPA have separate and distinct contracts with First Choice in the form of the Payor and Provider Contracts.  (Dkt. 22, ¶¶4.5, 4.17; Dkt. 26, Ex. A; Dkt. 35, Ex. A.)  *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("We need not accept as true conclusory allegations

REPORT AND RECOMMENDATION
PAGE - 11

that are contradicted by documents referred to in the complaint.")  WebTPA rejects the contention the doctrine of incorporation by reference can join new parties to a contract or make a new amalgamated contract out of original and incorporated documents.  Rather, "'[i]f the parties to a contract clearly and unequivocally incorporate by reference into their contract some other document, that document becomes part of their contract.'" *Wash. State Major League Baseball Stadium Public Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Const. Co.*, 176 Wn.2d 502, 517-18, 296 P.3d 821 (2013) (quoted and cited cases omitted).

Plaintiff's allegation of a Network Agreement is not conclusory.  In asserting incorporation by reference, plaintiff points to specific language within and attachments to the individual contracts.  WebTPA's Payor Contract states that the "Provider Agreement" referenced within "means the Health Care Facility Agreement and Preferred Provider/Group Agreement set forth in Exhibits H and I attached hereon and incorporated by reference[,]" and that the Payor "shall be responsible for compliance with all terms and conditions of the Provider Agreement."  (Dkt. 26, Ex. A, ¶¶1.16, 2.6.)  The Payor Contract provides that WebTPA "desires to secure the cost savings and other benefits of [First Choice's] Provider Agreements[.]"  (*Id.* at Recital B.)  In the Provider Contract, First Choice agrees to assist "in enforcing this Agreement as applicable to particular Payors by virtue of any applicable agreement between [First Choice] (or an Affiliate) and such delinquent Payor."  (Dkt. 35, ¶4.2.)  The Provider Contract provides for the pursuit of a judicial remedy for disputes between providers and payors.  (*Id.*, ¶9.2.)  WebTPA here offers general arguments regarding the elements of a contract and the doctrine of incorporation by reference.  It does not meaningfully address the specific allegations in the complaint as to a Network Agreement in which the Payor Contract incorporates the Provider Contract by reference.

Also, and as plaintiff observes, courts have found an oral contract where a healthcare payor

REPORT AND RECOMMENDATION
PAGE - 12

represents to a provider the payor will pay a specific rate for services provided to a patient. *Cal. Spine & Neurosurgery Inst. v. United Healthcare Ins. Co.*, No. 19-2417, 2019 U.S. Dist. LEXIS 159286 at *7-8 (N.D. Cal. Sep. 17, 2019) (complaint plausibly suggested formation of oral contract where payor gave express or implied assurances provider "'would be paid at least 70% of the usual and customary value of its medical services anticipated to be rendered'"); *Summit Estate, Inc. v. Cigna Healthcare of Cal., Inc.*, No. 17-3871, 2017 U.S. Dist. LEXIS 167462 at *10-12 (N.D. Cal. Oct. 10, 2017) (provider sufficiently alleged breach of express or implied oral contract by defendant insurers that provider would provide services in exchange for reimbursement at its usual and customary rates). WebTPA asserts an absence of consideration, distinguishing the out-of-network providers in those cases from plaintiff's status as an in-network provider with a preexisting duty to provide health care to Patient X. *Cal. Spine & Neurosurgery Inst.*, 2019 U.S. Dist. LEXIS 159286 at *2, and *Summit Estate, Inc.*, 2017 U.S. Dist. LEXIS 167462 at *40-42. However, the Court finds this assertion insufficient to show the allegation of an oral contract should be dismissed at this early stage in the proceedings, and the complaint to set forth sufficient facts supporting a Network Agreement or a possible oral agreement between Northwest and WebTPA.

2.    <u>Breach of Contract as Third Party Beneficiary of Payor Contract (Count II):</u>

Plaintiff avers the Payor Contract is a valid and enforceable contract between First Choice, WebTPA, and plaintiff as an intended, necessary, and direct third-party beneficiary. (Dkt. 22, ¶¶6.2, 6.10, 6.13.) Plaintiff alleges WebTPA and First Choice intended benefits to plaintiff and other Network Providers by requiring payment at fixed, guaranteed rates set forth in the Provider Agreements, and with WebTPA assuming direct obligations to Northwest, including, but not limited to, reimbursement at those rates. (*Id.*, ¶¶6.11, 6.12.)

REPORT AND RECOMMENDATION
PAGE - 13

1    WebTPA argues plaintiff's third-party beneficiary claim is subject to dismissal under the

2    plain language of the Payor Contract.   That contract states:  "The obligations of each party to this

3    Agreement shall inure solely to the benefit of the other party, and no person or entity shall be a

4    third-party beneficiary of this Agreement."  (Dkt. 26, Ex. A, ¶14.8.)  WebTPA asserts that, under

5    Washington law, a party "cannot recover as a third party beneficiary [where the] agreement

6    expressly disclaimed any third party rights."  *Haselwood v. Bremerton Ice Arena*, 137 Wn. App.

7    872, 877, 889-90, 155 P.3d 952 (2007) (agreement "specified that it was expressly made for the

8    sole benefit of BIA and the City, with no intention to create any third party rights.")  *See also*

9    *Minton v. Ralston Purina Co.*, 146 Wn.2d 385, 395-97, 47 P.3d 556 (2002); *Tooley v. Stevenson*

10   *Co-Ply*, 106 Wn.2d 626, 630-32, 724 P.2d 368 (1986); *Donald B. Murphy Contrs. v. King Cty.*,

11   112 Wn. App. 192, 194-97, 49 P.3d 912 (2002); *Riggins v. Bechtel Power Corp.*, 44 Wn. App.

12   244, 256, 722 P.2d 819 (1986).

13   A third-party beneficiary contract requires intent of a promiser to the contract to "assume

14   a direct obligation to the intended beneficiary at the time they enter into the contract.'"  *Lonsdale*

15   *v. Chesterfield*, 99 Wn.2d 353, 360-61, 662 P.2d 385 (1983) (quoting *Burke & Thomas, Inc. v.*

16   *Inter'l Org. of Masters*, 92 Wn.2d 762, 767, 600 P.2d 1282 (1979)).  "[T]he test of intent is an

17   objective one; the key is not whether the contracting parties had an altruistic motive or desire to

18   benefit the third party, but rather, 'whether performance under the contract would necessarily and

19   directly benefit' that party."  *Postlewait Constr. v. Great Am. Ins. Cos.*, 106 Wn.2d 96, 99, 720

20   P.2d 805 (1986) (quoting *Lonsdale*, 99 Wn. 2d at 362).  Benefits must flow directly from the

21   contract, rather than being merely incidental, indirect, or consequential.  *Kim v. Moffett*, 156 Wn.

22   App. 689, 699, 234 P.3d 279 (2010) (cited source omitted).  A court determines intent by

23   construing the terms of the contract as a whole and considering the circumstances under which the

REPORT AND RECOMMENDATION
PAGE - 14

contract was made. *Postlewait Constr.*, 106 Wn.2d at 99-100.  *See, e.g., Lonsdale*, 99 Wash. 2d at 362-63 (finding a property owner a third-party beneficiary to a contract where the contract "necessarily required" a contracting party to confer a benefit on the property owner:  "Under the terms of the contract, Sansaria could not fully perform its promise to install the water system without directly benefiting the petitioners as deeded owners of the lots.")

Plaintiff contends the Payor Contract objectively provides for direct obligations from WebTPA to Northwest.  (*See* Dkt. 26, Ex. A, ¶1.16 (defining Provider Agreement) and ¶2.6 (Payor "shall be responsible for compliance with all terms and conditions of the Provider Agreement."))  The contract reflects the intent of WebTPA to secure the cost savings and other benefits of Provider Agreements.  (Dkt. 26, Ex. A, Recital B.)  It attaches Provider Agreements as exhibits, incorporates the Provider Contract into the Payor Contract, and holds WebTPA "responsible for compliance with all terms and conditions of the Provider Agreement."  (*Id.*, ¶¶1.16, 2.6.)

Plaintiff contends the Network necessarily benefits plaintiff and necessarily requires WebTPA to benefit plaintiff.  WebTPA, for example, provides Northwest with patients to serve at agreed upon rates, payments for services within agreed upon time frames, requests for adjustments for incorrectly paid claims, EOBs, and the right to refuse WebTPA the benefit of preferred rates for deficient EOBs.  (*See id.*, ¶¶2.6.1, 2.6.1.1, 2.10, 2.11; *see also id.*, ¶2.6.5 (Payor "shall maintain a telephone number with sufficient lines to assure reasonable access to Providers for assistance in questions related to an EOB."), ¶3.6 (repricing provision involving First Choice, WebTPA, and providers); ¶2.7.1 (requiring Payor to issue compliant ID cards so that Northwest can confirm Network Patients or refuse services).)  The Payor Contract also, in requiring WebTPA's compliance with all terms and conditions of the Provider Agreement, provides Northwest the benefit of pursuing the judicial remedy set forth in the Provider Contract against WebTPA.  (*Id.*,

REPORT AND RECOMMENDATION
PAGE - 15

1    ¶¶1.16, 2.6; Dkt. 35, Ex. A, ¶9.2.)

2            Defendant does not establish the boilerplate disclaimer in the Payor Contract is dispositive

3    of plaintiff's third-party beneficiary claim.  The cases cited by WebTPA contain contracts and

4    disclaimers distinguishable from the contract and disclaimer at issue here.  The Payor Contract

5    disclaimer does not, for example, expressly prohibit third-party beneficiary status to Network

6    Providers.  *Cf. Donald B. Murphy Contrs.*, 112 Wn. App. at 194-96 (where contract specified

7    subcontractors would not be "recognized as having a direct relationship with the County" and were

8    not "intentional or incidental third-party beneficiaries" to the contract, the terms "unambiguously

9    reflect[ed] an intent to preclude all direct claims by subcontractors" as third-party beneficiaries).

10   Nor does this matter involve a contract entirely unrelated to the party seeking status as a third party

11   beneficiary, *see, e.g., Minton*, 146 Wn.2d at 395-97 (employee not a third-party beneficiary to a

12   "sale and purchase agreement" between buyer and seller of a company), and/or omitting any

13   mention of that party, *Tooley*, 106 Wn.2d at 630-31 (where contract did not mention "employees,

14   nonshareholder or otherwise, anywhere", it could not be construed as "*necessarily* and *directly*

15   benefit[ing]" the nonshareholders seeking third-party beneficiary status) (emphasis in original). [3]

16           As plaintiff observes, courts in other states have found third party beneficiary disclaimers

17   inapplicable where contracts contain specific language evidencing a clear intent to convey benefits

18   to a third party.  For instance, in *IV Sols., Inc. v. United HealthCare Servs., Inc.*, 2017 U.S. Dist.

19

20           [3] In *Haselwood*, 137 Wash. App. at 880, 890, the court substantively addressed the enforceability

21   and scope of a mechanic's lien asserted by a subcontractor on a construction project and otherwise only
     summarily denied the subcontractor's motion to amend to add a third-party beneficiary claim based on the

22   existence of a general third-party beneficiary disclaimer.  In *Riggins*, 44 Wn. App. at 256, the court rejected
     defendant's third-party beneficiary claim to an indemnification clause between plaintiff's employer and

23   another entity where the clause expressly provided no provision was intended or was to be construed to be
     for the benefit of a third party.

REPORT AND RECOMMENDATION
PAGE - 16

LEXIS 210782 at *36-38 (C.D. Cal. 2017), a court denied a PPO network participating payor's motion to dismiss a participating health care provider's claim to enforce a payor contract as a third party beneficiary where contractual provisions required the payor to make payments to providers in the network. The provider was a member of an "expressly identified class to which a duty is owed" and entitled to third-party beneficiary status. *Id.* The payor's reliance on language limiting third-party rights "elevated form over substance[,]" and the "boilerplate 'no third party beneficiaries' clause" did not "operate to disclaim any intent to create third party beneficiaries where the [agreement] contain[ed] other more specific provisions suggesting the presence of just such an intent." *Id.*[4] *See also Prouty v. Gores Tech. Group*, 121 Cal. App. 4th 1225, 1233-35, 18 Cal. Rptr. 3d 178 (2004) (finding third party beneficiaries despite general disclaimer where a provision created an exception by "expressly grant[ing] rights to specific third persons"); *Diamond Castle Partners IV PRC, L.P. v IAC/InterActiveCorp*, 82 A.D.3d 421, 421-22, 918 N.Y.S.2d 73 (N.Y. App. Div. 2011) (holding "plaintiffs enforceable rights . . . were not extinguished by the 'boilerplate no third-party beneficiary language' . . . [i]n light of numerous contract provisions granting plaintiffs enforceable rights").

While denying any of the provisions of the Payor Contract indicate a clear and express intent to benefit Northwest, WebTPA does not sufficiently address the contract as a whole or the numerous provisions pointed to by plaintiff in its response to the motion to dismiss. (*See* Dkt. 36

---

[4] The court in *Baylor Univ. Med. Ctr. v. Epoch Group, L.C.*, 340 F. Supp. 2d 749, 755-56 (N.D. Tex. 2004), similarly rejected the applicability of a disclaimer where other contractual provisions obligated the defendant health plan claims supervisor to pay the plaintiff provider for medical services and to otherwise comply with the provider's agreement. Considering the contract as a whole, the court found the only reasonable interpretation was that defendant and its clients were only entitled to the benefits of the agreement if defendant "agreed to be a Payor by executing [a] Payor Acknowledgment[]" and therein assumed both the right to plaintiff's discounted medical services and the obligation to pay plaintiff in accordance with its provider agreement. *Id.*

REPORT AND RECOMMENDATION
PAGE - 17

at 10.)  Nor does WebTPA persuasively distinguish the case law allowing for third party beneficiaries despite a contract's inclusion of a boilerplate disclaimer.  For instance, while noting Washington law favors "[i]nterpretations giving lawful effect to all the provisions in a contract . . . over those that render some of the language meaningless or ineffective[,]" WebTPA omits reference to the fact that, "[w]hen an inconsistency arises between a general and a specific provision, the specific provision qualifies the meaning of the general provision."  *Grey v. Leach*, 158 Wn. App. 837, 850, 244 P.3d 970 (2010).  Plaintiff's third party beneficiary claim is therefore not subject to dismissal for failure to state a claim.

   3. <u>Breach of the Implied Covenant of Good Faith and Fair Dealing (Count IV):</u>

   WebTPA asserts the allegation of a breach of the implied covenant of good faith and fair dealing is derivative of the contract claims and therefore also necessarily subject to dismissal. *Johnson v. Yousoofian*, 84 Wn. App. 755, 762, 930 P.2d 921 (1996) ("The implied duty of good faith is derivative, in that it applies to the performance of specific contract obligations. If there is no contractual duty, there is nothing that must be performed in good faith.") (internal citations omitted).  *Accord Hard2Find Access., Inc. v. Amazon.com, Inc.*, No. 14-36059, 2017 U.S. App. LEXIS 8975 at *4-5 (9th Cir. May 23, 2017).  Because the Court finds both the breach of contract and third party beneficiary claims to withstand scrutiny, WebTPA does not show the allegation of a breach of the implied covenant of good faith and fair dealing should be dismissed.

   4. <u>Promissory Estoppel (Count V):</u>

   Promissory estoppel renders a promise made without consideration enforceable.  *King v. Riveland*, 125 Wash.2d 500, 506, 886 P.2d 160, 164 (1994).  To state a claim for promissory estoppel, a plaintiff must allege:  "(1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his

REPORT AND RECOMMENDATION
PAGE - 18

position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise."  *Id*.  A promise is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."  *Elliott Bay Seafoods, Inc., v. Port of Seattle*, 124 Wash. App. 5, 13, 98 P.3d 491 (2004) (internal quotation marks and quoted source omitted).

The complaint alleges that, under the Payor and Provider Contracts, WebTPA promised to pay for services provided to Patient X at the Network Rate and, in inducing Northwest to accept and treat Patient X, WebTPA prepared Patient X's insurance card featuring the First Choice logo. (Dkt. 22, ¶¶9.1-9.7.)  It further alleges Northwest called WebTPA and "Patty B" confirmed Northwest would be reimbursed at the Network Rate.  (*Id*., ¶9.8.)  Plaintiff avers it accepted and provided treatment to Patient X in reliance on contractual representations of WebTPA and First Choice, Patient X's ID card, and WebTPA's representation regarding reimbursement, suffered damages as a result of WebTPA's refusal to pay at the Network Rate as represented, and that it will suffer injustice if defendants are permitted to renege on their promises.  (*Id*., ¶¶9.9-9.17.)

WebTPA argues the mere confirmation of coverage by Patty B, the ID card, or any similar verification of health benefits cannot support a claim for promissory estoppel.  *See Summit Estate, Inc.*, 2017 U.S. Dist. LEXIS 167462 at *16-17 (mere "representations about the terms of certain insurance policies" did "not amount to a clear and unambiguous promise by Defendants to pay for substance abuse treatment services at the [usual, customary and reasonable rate ("UCR")).  WebTPA also denies Patty B had actual or apparent authority to change the terms of Patient X's health plan or that plaintiff could have reasonably relied on a short telephone conversation with a WebTPA employee as reflecting such authority.  *See generally King*, 125 Wn.2d at 507 (actual authority requires objective manifestations by principal to agent "which the principal is deemed to

have actually intended the agent to possess."; with apparent authority, objective manifestations must cause a third person to actually or subjectively believe the agent has authority to act for principal, with that actual, subjective belief being objectively reasonable) (citations omitted).

WebTPA further contends plaintiff was well aware the terms of Patient X's health plan would control the benefits paid and points to the disclaimers on the back of the ID card (*see* Dkt. 35, Ex. B ("American Indian and Alaska Native members may have Medicare Like Rates applied"; "This card is not a guarantee of benefits")) as refuting the existence of a promise to pay more than allowed under that plan.[5] WebTPA asserts plaintiff cannot show it relied on a promise causing it to change its position given its separate acknowledgment it had no discretion to deny treatment. (Dkt. 22, ¶4.8.) Alternatively, WebTPA asserts the Payor Contract or its contract with the Spokane Tribe govern this matter and preclude equitable relief. *See Bardy v. Cardiac Sci. Corp.*, C13-0778-JLR, 2013 U.S. Dist. LEXIS 147018 at *16 (W.D. Wash. Oct. 10, 2013) ("'[T]he doctrine of promissory estoppel does not apply where a contract governs' the conduct at issue.") (quoting *Spectrum Glass v. PUD of Snohomish*, 129 Wn. App. 303, 317, 119 P.3d 854 (2005)).

The Court, however, finds no basis for granting WebTPA's motion to dismiss and plaintiff's allegations sufficient to state a claim of promissory estoppel. As argued by plaintiff, WebTPA's arguments rely in significant part on documents and factual allegations outside the complaint and not properly considered in ruling on a Rule 12(b)(6) motion to dismiss. The Court

---

[5] WebTPA repeatedly asserts Washington law requires a "clear and definite" promise to state a clam for promissory estoppel, citing to *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 442-43, 876 P.2d 435 (1994). However, in that case, the Washington Supreme Court found a "clear and definite" promise applicable "[i]n the employment context, 'where the terminable at will doctrine is concerned[.]'" *Corey v. Pierce County*, 154 Wn.App. 752, 768-69, 225 P.3d 367 (2010) (quoting *Havens*, 124 Wh.2d at 173 (quoting 1Paul H. Tobias, Litigating Wrongful Discharge *769 Claims § 4.52, at 4–89 (1993))). WebTPA does not cite to any case law applying that standard beyond the employment context.

REPORT AND RECOMMENDATION
PAGE - 20

may not, for example, rely on the content of Patient X's health plan or WebTPA's allegations as to the impact of the ID disclaimers absent consideration of that plan. The Court must accept the allegations in the complaint as true and leave factual disputes for resolution at a later date. *See, e.g.*, *Lee*, 250 F.3d at 688 ("[F]actual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)."; reversing dismissal where district court "assumed the existence of facts that favor defendants based on evidence outside plaintiffs' pleadings, took judicial notice of the truth of disputed factual matters, and did not construe plaintiffs' allegations in the light most favorable to plaintiffs.")

Nor does WebTPA sufficiently address plaintiff's promissory estoppel claim as alleged. Plaintiff does not allege its reliance on any single representation on the part of WebTPA. Plaintiff avers its reliance on multiple representations on the part of WebTPA and First Choice, including presentation of the ID card containing the First Choice logo, Patty B's confirmation plaintiff would be reimbursed at the Network Rate, and contractual promises that WebTPA would provide reimbursement at that rate and that First Choice would require WebTPA to meet that obligation. Plaintiff does not, moreover, allege Patty B or the ID merely confirmed coverage. Plaintiff alleges WebTPA explicitly and repeatedly represented a specific rate would be paid for the health care services provided. *See, e.g., Cal. Spine & Neurosurgery Inst.*, 2019 U.S. Dist. LEXIS 159286 at *10-12 (finding allegations sufficient to state a promissory estoppel claim where plaintiff did not allege defendant "merely verified coverage" or authorized treatment and, instead, alleged defendant "gave 'express and/or implied resultant assurances' that Plaintiff 'would be paid at least 70% of the usual and customary value of its medical services anticipated to be rendered.'"; distinguishing *Summit Estate, Inc.*, 2017 U.S. Dist. LEXIS 167462, wherein the court found it important "the alleged actions were 'merely representations about the terms of certain insurance

REPORT AND RECOMMENDATION
PAGE - 21

policies' and not a 'clear and unambiguous promise by Defendants to pay for . . . services at the UCR.'")   Plaintiff further satisfies the pleading requirements by alleging it reasonably and detrimentally relied on these promises in agreeing to provide treatment to Patient X and that injustice will result if defendants' promises are not enforced.

Finally, and contrary to WebTPA's suggestion, plaintiff may plead different causes of action in the alternative.  *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.")  *Accord Vernon v. Qwest Communs. Int'l, Inc.*, 643 F. Supp. 2d 1256, 1266-67 (W.D. Wash. 2009); *Summit*, 2017 U.S. Dist. LEXIS 167462 at *11.  Plaintiff may therefore allege an express contract with WebTPA, including its obligation to provide treatment upon Patient X's presentation of a compliant ID card, while alternatively alleging a claim of promissory estoppel.

5.    Implied-in-Fact Contract (Count VI):

Plaintiff also alternatively alleges an implied-in-fact contract claim against WebTPA.  That is, if no enforceable contract is found to exist, plaintiff avers the facts and circumstances – including the promises made by WebTPA and the terms of the Provider and Payor Contracts – compel the conclusion WebTPA and plaintiff had a mutual, binding understanding that plaintiff was contractually obligated to provide dialysis services to Patient X in exchange for payment by WebTPA at the Network Rate.  (Dkt. 22,  ¶¶10.1-10.16.)

Under Washington law, an implied-in-fact contract is an agreement arising from the parties' acts and conduct viewed in light of surrounding circumstances, not from written or spoken words.  *Milone & Tucci, Inc. v. Bona Fide Builders, Inc.*, 49 Wn.2d 363, 367-68, 301 P.2d 759 (1956).  *Accord Henson v. Employment Sec. Dep't*, 113 Wn.2d 374, 379, 779 P.2d 715 (1989).

"'Like an express contract, it grows out of the intentions of the parties to the transaction, and there must be a meeting of minds.'"  *Milone & Tucci, Inc.*, 49 Wn.2d at 368 (emphasis and quoted source omitted).  There must be an offer, acceptance, mutual consent, and intention to contract.  *Id.*; *Chandler v. Washington Toll Bridge Auth.*, 17 Wn.2d 591, 600, 137 P.2d 97 (1943); *Seashore Villa Ass'n v. Huggland Family Ltd. P'ship*, 163 Wn. App. 531, 545, 260 P.3d 906 (2011).

WebTPA argues its confirmation of coverage does not suffice to create a meeting of the minds in which it agreed to pay "whatever unstated rates" (Dkt. 25 at 18) sought by Northwest. *See, e.g., Pacific Bay Recovery, Inc. v. Cal. Physicians' Services, Inc.*, 12 Cal. App. 5th 200, 216, 218 Cal. Rptr. 3d 562 (2017) (finding allegations lacked specific facts necessary for determining whether there was a meeting of the minds and, at best, alleged defendant insurer admitted a subscriber "was covered under one of its health plans and that it would pay something" for treatment, without a description of the type or extent of treatment and an agreement as to what defendant would pay).  WebTPA asserts it could not make any such promise given that it was bound by the terms of coverage specified in Patient X's health plan, that Northwest was aware the rates in that plan would apply, and that that plan governs the subject matter and therefore precludes a claim for breach of an implied contract.  WebTPA also asserts the absence of any allegations WebTPA made a request of plaintiff or that plaintiff provided any services, or delivered anything of value, to WebTPA.  *See Young v. Young*, 164 Wn.2d 477, 485-86, 191 P.3d 1258 (2008) (defining the elements of an implied-in-fact contract as "(1) the defendant requests work, (2) the plaintiff expects payment for the work, and (3) the defendant knows or should know the plaintiff expects payment for the work.")

Again, however, WebTPA impermissibly relies on documents and factual allegations not properly considered in ruling on the motion to dismiss, and fails to adequately address plaintiff's

1    allegations as set forth in the First Amended Complaint.  Plaintiff sufficiently states a claim of an

2    implied-in-fact contract by alleging conduct including WebTPA's issuance of an ID card

3    containing the First Choice logo and verbal confirmation it would reimburse plaintiff at the

4    Network Rate for services provided to Patient X, as well as other facts and circumstances making

5    up the mutually beneficial relationship between Northwest, First Choice, and WebTPA; plaintiff's

6    expectation it would be reimbursed at the Network Rate for services it provided as a result of

7    WebTPA's conduct; and that WebTPA knew plaintiff expected payment at the Network Rate for

8    the services Northwest provided.  (*See* Dkt. 22, ¶¶10.2-10.13.)

9        WebTPA also fails to support its contention another contractual agreement precludes

10   plaintiff's alternative allegation of an implied-in-fact contract.  WebTPA cites to case law holding

11   that "'[a] party to a valid express contract is bound by the provisions of that contract, and may not

12   disregard the same and bring an action on an implied contract relating to the same matter, in

13   contravention of the express contract.'"  *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102,

14   146, 323 P.3d 1036 (2014) (quoting *Chandler*, 17 Wn.2d at 604).  However, WebTPA here points

15   to Patient X's health plan, and not to any express contract between plaintiff and WebTPA, as

16   precluding an implied contract.  Plaintiff may, as stated above, plead allegations in the alternative.

17       6.    <u>Declaratory Judgment (Count VII)</u>:

18       WebTPA argues that, if the Court dismisses plaintiff's other claims, the claim for

19   declaratory relief necessarily fails given the absence of any actual controversy between the parties.

20   *See Fed. Way Sch. Dist. No. 210 v. State*, 167 Wn.2d 514, 529, 219 P.3d 941 (2009) ("To be

21   justiciable under the Uniform Declaratory Judgments Act, a controversy must be an actual, present,

22   and existing dispute, not possible, dormant, or hypothetical.")  Because the Court does not find

23   plaintiff's other claims subject to dismissal, this related argument sets forth no basis for relief.

REPORT AND RECOMMENDATION
PAGE - 24

CONCLUSION

For the reasons stated above, plaintiff's motion to strike should be GRANTED and defendant's motion to dismiss should be DENIED.

OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **April 10, 2020**.

DATED this 26th day of March, 2020.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 25