1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

INLAND NORTHWEST RENAL
CARE GROUP, LLC,

11                                    Plaintiff,

12          v.

13

WEBTPA EMPLOYER SERVICES,
LLC et al.,

14                                    Defendants.

15
16

CASE NO. C19-1758-JCC-SKV

REPORT AND RECOMMENDATION

17                    **I. INTRODUCTION**

18          Plaintiff Inland Northwest Renal Care Group, LLC, d/b/a Northpointe Dialysis

19  ("Northwest") raises contractual, quasicontractual, and negligence claims against defendants

20  WebTPA Employer Services LLC ("WebTPA"), and First Choice Health Network, Inc. ("First

21  Choice"), in its Second Amended Complaint.  Dkt. 66.  WebTPA filed a Motion for Judgment on

22  the Pleadings, seeking dismissal of the case for failure to join an indispensable party.  Dkt. 77.

23  First Choice joined the motion.  Dkt. 89.  Northwest opposes the motion, moves to strike certain

24  arguments WebTPA raised in its reply brief, Dkt. 91, and requests oral argument.  Dkts. 84, 93.

The undersigned, having considered the briefing and evidence properly considered in support, finds oral argument unnecessary and concludes the motion to dismiss should be DENIED and the motion to strike should be GRANTED in part and DENIED in part.

## II. BACKGROUND

Plaintiff Northwest is a healthcare provider and provides outpatient renal dialysis and related services to a patient referred to in the Second Amended Complaint and hereinafter as "Patient X." Dkt. 66 at ¶1.1. Defendant WebTPA provides administrative services for group health plans and adjudicates healthcare providers' claims for payment. *Id.* WebTPA formerly provided administrative services for the group health plan of which Patient X is a member, but stopped providing services to that plan at the beginning of March 2020. Dkt, 77 at 4; *see also* Dkt. 84 at 15. Defendant First Choice operates a healthcare preferred provider organization (PPO) network (the "Network") and contracts with both healthcare providers, such as Northwest, and third-party administrators for healthcare services, or "payors," such as WebTPA. *Id.* at ¶4.2. Through such contracting, customers of payors receive access to the services of providers in the Network.

WebTPA entered a contract with First Choice—the First Choice Health PPO Network, Inc. Contract Holder Agreement ("Payor Contract")—effective May 1, 2009. *Id.* at ¶4.17; Dkt. 86-3 (Payor Contract). Northwest entered the First Choice Health Network Healthcare Facility Agreement (the "Provider Contract") with First Choice on June 1, 2011, and as later amended, and became a participating "Network Provider." Dkt. 66 at ¶4.5; Dkt. 86-1 (Provider Contract). The Payor Contract explicitly incorporates the Provider Contract by reference, attaching two example versions of First Choice model Provider Contracts as exhibits. Dkt. 84 at 7. WebTPA agreed in the Payor Contract to be bound by the terms of any First Choice Provider Contract.

According to Northwest, the salient provisions of the Payor and Provider Contracts together comprise the "Network Agreement," a valid and enforceable contract between Northwest, First Choice, and WebTPA. Dkt. 66 at 14. In this suit, Northwest alleges defendants refused to pay Northwest at the contractually agreed-upon rates for dialysis services provided to Patient X.

The Provider Contract obligates Northwest to provide renal dialysis services to any patient covered by a health plan offered or administered by a payor contracted to participate in the Network, "i.e., a Network Patient." Dkt. 66, ¶4.6; Dkt. 86-1 at ¶¶2.1, 3.9. Northwest must provide those services at specified facilities, including Northpointe Dialysis Unit in Spokane, Washington. Dkt. 66 at ¶4.7; Dkt. 86-1 at ¶2.1, Sched. C. Treatment must be provided to Network Patients presenting insurance identification (ID) cards containing the First Choice logo or otherwise where the payor is listed as a Network Payor on the First Choice website. Dkt. 66 at ¶4.8; Dkt. 86-1 at ¶¶2.1, 3.9.

First Choice "shall require all Payors" to pay Northwest for covered services rendered to Network Patients pursuant to Schedule B of the Provider Contract. Dkt. 66 at ¶4.10; Dkt. 86-1 at ¶¶3.1, 4.2. Schedule B specifies that "reimbursement for Outpatient Dialysis and Related Services shall be [at the Network Rate of] eighty percent (80%) of [First Choice's] full-billed charges." Dkt. 66 at ¶4.11; Dkt. 86-1 at Sched. B. First Choice "has the contractual ability to bind the Payors to the terms of [the Provider Contract] (as applicable thereto) and to cause them to be responsible for their resulting obligations hereunder." Dkt. 66 at ¶4.12; Dkt. 86-1 at ¶4.2. First Choice must ensure payors produce an Explanation of Benefits (EOB) during the claim adjudication process, "which must, at a minimum, identify: [First Choice], total billed charges, [and the] allowed amount in accordance with [Network] fee schedules, amount Payor responsible

to pay, amount Participant responsible to pay, and explanation for non-payment[.]'" Dkt. 66 at ¶4.13; Dkt. 86-1 at ¶3.11.

Northwest, in turn, must accept payment as provided for in Schedule B and may not bill or collect from Network Patients any portion of its charges or any portion of the Network Rates for covered services, with the exception of deductibles, co-payments, and co-insurance, even in the event of "non-payment by Payor" or breach of the contract. Dkt. 66 at ¶4.14; Dkt. 86-1 at ¶2.8.1. If Northwest is not paid by a payor, First Choice must assist Northwest in enforcing the Provider Contract "as applicable to particular Payors by virtue of any applicable agreement between [First Choice] (or an affiliate)" and the delinquent payor, and collecting any payments owed. Dkt. 66 at ¶4.15; Dkt. 86-1 at ¶4.2. Where informal efforts at dispute resolution fail, either party may pursue a judicial remedy. Dkt. 66 at ¶4.16; Dkt. 86-1 at ¶9.2.

WebTPA is a Network Payor. Dkt. 66 at ¶¶4.9, 4.17-4.34. Under the Payor Contract, WebTPA "desires to secure the cost savings and other benefits of [First Choice's] Provider Agreements for the benefit of its Payors, Benefit Plans and Benefit Plan Participants." Dkt. 86-3 (Payor Contract, without referenced exhibits), Recital B. WebTPA must comply with "all terms and conditions" of the "Provider Agreement" attached as exhibits to the contract, and defined as the Health Care Facility Agreement and Preferred Provider/Group Agreement. *Id*. at ¶¶1.16, 2.6. Compliance includes processing claims and producing an EOB "in accordance with [First Choice] Provider fee schedules" and hospital rates for services covered under a benefit plan, and including the same minimum requirements described above. *Id*. at ¶2.6.1. "All charges for services provided to Participants by [First Choice] Participating Providers under the terms of any Benefit Plan shall be in accordance with [First Choice] provider fee schedules and hospital

rates." *Id*. at ¶3.4.  WebTPA must also issue ID cards compliant with specifications set by First

Choice, including the First Choice name and/or logo.  *Id*. at ¶¶2.7.1, 3.7.

Patient X, a Network Patient, sought to arrange outpatient renal dialysis treatment and

related services beginning in or around September 2017.  The ID card Patient X presented to

Northwest included the First Choice logo.  Dkt. 66 at ¶4.38; Dkt. 35, Ex. B.  Northwest avers the

ID card "did not include any specialty exclusions that would have impacted Northwest, a First

Choice Provider."  Dkt. 66 at ¶4.38.  Northwest further avers that, on or about September 13,

2017, Northwest contacted WebTPA regarding Patient X's insurance coverage and a WebTPA

representative "named Patty B confirmed that Northwest was 'in-network' with WebTPA and

that services Northwest provided to Patient X would be reimbursed at the Network Rates."  *Id*. at

¶4.39.  Northwest proceeded to treat Patient X and continues to provide treatment to date.

Northwest alleges that, while administering the claims for payment submitted by

Northwest, WebTPA provided reimbursement at rates "substantially below the Network Rates,

and often as low as 7%" of those rates and did not issue compliant EOBs.  *Id*. at ¶¶4.44-4.45.

Northwest sent letters notifying WebTPA of underpayment for services provided to Patient X

and demanding reimbursement at the Network Rate.  *Id*. at ¶¶4.46-4.47.  In April 2018, WebTPA

sent Northwest a letter indicating a delay in response due to the need for additional information

and that an additional response would follow.  *Id*. at ¶4.47.  Northwest did not receive a further

response or funds meeting the Network Rates.  *Id*.

On September 10, 2019, Northwest sent a letter notifying First Choice of WebTPA's

refusal to pay Northwest at Network Rates for services provided to Patient X.  *Id*. at ¶4.49.

Northwest requested First Choice comply with its contractual obligations and require WebTPA

to pay Northwest at the Network Rate; ensure WebTPA produce an EOB reflecting an allowed

amount in accordance with First Choice fee schedules; and assist Northwest in enforcing WebTPA's obligations under the Payor and Provider Contracts and in collecting payments owed by WebTPA. *Id.* Northwest alleges First Choice has neither required reimbursement by WebTPA, nor otherwise complied with its contractual obligations. *Id.* at ¶4.50. As of the date of its Second Amended Complaint, Northwest attested to sustaining damages of some $1.5 million. *Id.* at ¶4.52.

The Second Amended Complaint clarifies that Northwest is "<u>not</u> suing under ERISA to recover benefits under Patient X's health plan, but solely based on the independent contractual and other legal duties owed by defendants WebTPA and First Choice[.]" *Id.* at ¶1.6 (emphasis in original). It notes all of Patient X's claims have been adjudicated and paid, albeit not at Network Rates, meaning WebTPA determined the services provided are covered under Patient X's health plan. *Id.* Northwest avers that, "upon information and belief, neither First Choice nor WebTPA provided Patient X's health plan to Northwest prior to Northwest commencing treatment[.]" *Id.*

WebTPA describes the health plan ("Plan") it administered on behalf of the Spokane Tribe of Indians ("Tribe") as "'self-funded,' meaning that the Tribe pays for the Plan's benefits out of its own pocket." Dkt. 77 at 2; (citing Dkt. 26-3 ("Plan")). According to WebTPA, it was hired by the Tribe to "help with the day-to-day administration of the [Plan]." *Id.* That relationship was controlled by the Administrative Services Agreement ("ASA"). *See* Dkt. 26-2 ("ASA")). WebTPA did not make the Tribe or the Plan party to the Payor Contract. Dkt. 84 at 7. Nevertheless, WebTPA alleges the Tribe agreed in the ASA to indemnify it for "any claim by any health provider related to payment or reimbursement for services provided to" Patient X. Dkt. 77 at 3 (citing Dkt. 26-2 at ¶1.6). WebTPA stopped providing services under the ASA at the beginning of March 2020. Dkt, 77 at 4; *see also* Dkt. 84 at 15.

1    Based on the indemnification provision in the ASA, WebTPA now argues the Tribe is an

2    indispensable party to this litigation under Federal Rule of Civil Procedure 19.  Because of the

3    Tribe's 11th Amendment tribal sovereignty, however, WebTPA contends it cannot be joined and

4    as a result, the entire case must be dismissed.

5                                    **III. DISCUSSION**

6    **A.  Standard of Review**

7         Defendant seeks dismissal under Federal Rule of Civil Procedure 12(c) for failure to join

8    an indispensable party to the litigation.  *See* Fed. R. Civ. P. 19.  Consideration of a motion under

9    Rule 12(c) is "functionally identical" to that of a motion brought under Rule 12(b)(6), and the

10   standard of review is the same.  *Gregg v. Hawaii, Dep't of Safety*, 870 F.3d 883, 886-87 (9th Cir.

11   2017) (citing *Cafasso, U.S. ex rel. v. Gen, Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th

12   Cir. 2011)).  In deciding the motion, the Court "may consider any of the pleadings, including the

13   complaint, the answer, and any written instruments attached to them."  2 Moore's Federal

14   Practice - Civil § 12.38 (2022).  Dismissal is only appropriate if the moving party has "clearly

15   establishe[d] on the face of the pleadings that no material issue of fact remains to be resolved and

16   that it is entitled to judgment as a matter of law."  *Enron Oil Trading & Transp. Co. v. Walbrook*

17   *Ins. Co.*, 132 F.3d 526, 529 (9th Cir. 1997).  As with a Rule 12(b)(6) motion, the Court must

18   view the facts in the light most favorable to the nonmoving party and must accept that party's

19   allegations as true.  *See Cafasso*, 637 F.3d at 1053.

20   **B.  Motion for Judgment on the Pleadings for Failure to Join an Indispensable Party**

21        In a motion for judgment on the pleadings for failure to join an indispensable party, the

22   burden is on the moving party to show the absentee is indispensable under Rule 19.  *Makah*

23   *Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).  In conducting this analysis, courts

24   make "three successive inquiries."  *E.E.O.C. v. Peabody W. Coal Co*., 400 F.3d 774, 779 (9th

Cir. 2005).  First, the court must "determine whether a nonparty should be joined under Rule19(a)"—or in other words, whether the absentee is a required party.  *Id*.  Second, if the absent party is required, the court must "determine whether it is feasible to order that the absentee be joined."  *Id*.  And third, if joinder of the absentee party is not feasible, the court must decide "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).  A party is only "indispensable" under Rule 19 if it is determined to be (i) a required party that (ii) cannot be joined to the litigation and (iii) the court determines it would be "preferable to dismiss the action, rather than to retain it" in that party's absence."  *Peabody W. Coal Co*., 400 F.3d at 779-780.  Under Rule 19, an indispensable party is one that "not only ha[s] an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience."  *Id*. (quoting *Shields v. Barrow*, 58 U.S. 130, 139 (1854)).

1.  Required Party Analysis Under Rule 19(a)

To determine whether an absent party is a required party under the first Rule 19 inquiry, the court must conduct a two-prong analysis.  *Makah Indian Tribe*, 910 F.2d at 558; *see also* Fed. R. Civ. P. 19(a).  First, the court must determine whether it can accord complete relief among those already party to the suit.  *Id.*  Second, the court must decide whether the absent party has claimed a legally protected interest in the suit and "is so situated that disposing of the action in [its] absence may: (i) as a practical matter impair or impede [its] ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring [multiple] or otherwise inconsistent obligations because of the interest."  *Id.*

a. *The Court can accord complete relief among the existing parties.*

The "complete relief" requirement under Rule 19 is "concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action." *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043 (9th Cir. 1983). The causes of action Northwest raises in its second amended complaint are predicated on the Provider Contract between Northwest and First Choice, and the Payor Contract between First Choice and WebTPA. Because the parties to these contracts—Northwest, WebTPA, and First Choice—are existing parties to this suit and will each be bound by the decisions this Court makes regarding their contractual relationships, there is no reason the Court cannot grant complete relief here. Nor is there a risk of multiple lawsuits involving the same causes of action—neither the Tribe nor the Plan are a party to the contracts at issue, and thus cannot sue or be sued under either contract. *See Northrop Corp.*, 705 F.2d at 1044 ("A nonparty to a commercial contract ordinarily is not a necessary party to an adjudication of rights under the contract.").

Despite this, WebTPA contends it would be impossible for the Court to accord complete relief in this litigation for three reasons. First, WebTPA argues that because the Tribe "bears full responsibility for the payment of Plan benefits and the Tribe must indemnify WebTPA for the claims at issue in this case," any relief awarded to Northwest would be "partial or hollow." Dkt. 77 at 11. But WebTPA's argument mischaracterizes the causes of action at issue in this case. Northwest has repeatedly argued it is *not* suing for benefits under the Plan, but rather for the full benefit of its bargain with WebTPA and First Choice under the Network Agreement. *See, e.g.,* Dkt. 66 at ¶1.6 ("Northwest is <u>not</u> suing in this action under ERISA to recover benefits under [the Tribal Plan], but solely based on the independent contractual and other legal duties owed by

1 the Defendants WebTPA and First Choice to pay Northwest at the Network rates."); *see also*

2 Dkt. 44 at 10 ("Plaintiff does not seek reimbursement under the [Tribal Plan].").

3          Furthermore, in the event Northwest is awarded a judgment against WebTPA or First

4 Choice in this litigation, each defendant would be obligated to satisfy that judgment as

5 applicable.  Such relief is neither partial nor hollow, and the dispute between WebTPA and the

6 Tribe over indemnification of Northwest's claims is a separate matter.  Moreover, WebTPA's

7 assertion that the Tribe is financially responsible for the outcome of this case is conclusory.  That

8 these two parties are already engaged in arbitration to *determine* such liability is evidence that

9 this is not a settled issue.  *See, e.g.,* Dkt. 77 at 10 ("The Tribe and WebTPA are engaged in

10 arbitration over whether [the ASA] indemnification clause covers Northwest's claims in this

11 lawsuit.").

12          Second, WebTPA argues the Court cannot accord complete relief here because WebTPA

13 ceased to provide services to the Tribe in March 2020, so any forward-looking relief Northwest

14 seeks in its second amended complaint, Dkt. 66, cannot be granted.  Dkt. 77 at 11; Dkt. 91 at 6-7.

15 But Northwest is not seeking forward-looking relief against the defendants here.  WebTPA is

16 correct in pointing out that Northwest's second amended complaint, filed February 1, 2022,

17 states that damages caused by WebTPA and First Choice "continue to accrue."  Dkt. 66 at ¶5.14.

18 WebTPA also accurately notes Northwest's seventh cause of action purports to seek a "judicial

19 declaration [that] will *inform the parties' future conduct*." Dkt. 66 at ¶11.4 (emphasis added).

20 Northwest reiterates in its opposition brief, however, that any claims it may have against

21 WebTPA or First Choice stopped accruing when WebTPA ceased to provide services to the

22 Tribe.  Dkt. 84 at 15-16.  ("Northwest does not have any claims for future relief in this lawsuit

23 that post-date WebTPA's termination as third party administrator for the Plan on March 31,

24

2020.").  It has billed Medicare, and not WebTPA, for dates of service after March 1, 2020 and disavows "any claims . . . against WebTPA for dates of service" after it "ceased to have obligations for payment pursuant to the First Choice contracts."  *Id.* at 15 (citing Dkt. 85 (Decl. of Teresa Andrillon) at ¶9).  Moreover, the specific performance Northwest seeks in the eighth cause of action is for First Choice to carry out its contractual obligation to "'require' WebTPA to reimburse Northwest at the Network Rates for the services Northwest provided to Patient X." Dkt. 66 at 28.  Such relief is possible to accord between the parties here.  The second amended complaint can be read in such a way as it does not seek forward-looking relief and, viewing the facts in the light most favorable to the non-moving party, the Court should choose to read it that way.

Even if the complaint did plead a claim for forward-looking relief, Northwest argues such claims have been moot since March 2020.  *See, e.g.,* Dkt. 84 at 15-16.  WebTPA avers Northwest is judicially estopped from acknowledging mootness here because "[i]n February 2020, Northwest persuaded the Court to deny a motion to dismiss, in part, by representing that its forward-looking claims are 'not moot' because 'an actual controversy will remain.'"  Dkt. 91 at 6-7.  But this argument, made by Northwest in briefing filed nearly two years ago, was in response to assertions made by WebTPA in its motion to dismiss, Dkt. 25, that have no relevance here.  *Id.*  In that motion, WebTPA asserted that "[i]f the Court grants [its] motion to dismiss as to [Northwest's] other claims, then [the claim for declaratory relief] must necessarily fail as moot because there will be no actual controversy between WebTPA and Northwest."  Dkt. 25 at 19. Northwest's response—that a controversy would remain between the parties even if its remaining causes of action were dismissed—has, therefore, no bearing on the present question of whether any forward-looking claims raised in the second amended complaint are moot because

1  WebTPA stopped providing services for the Tribe in March 2020.  This distinction is made even

2  clearer by the fact that briefing for the motion to dismiss was complete by the end of February

3  2020, which pre-dates WebTPA's cessation of services to the Tribe.  "[M]ootness can arise at

4  any stage of litigation," and "federal courts may not 'give opinions upon moot questions or

5  abstract propositions.'"  *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (citations omitted).  To

6  the extent Northwest's complaint seeks any inappropriately forward-looking relief, such claim

7  was mooted when WebTPA stopped providing services for the Tribe in March 2020.

8  Third, WebTPA avers the Court cannot award past damages without the Tribe's presence

9  because "the parties [sic] dispute centers on whether the Tribe is the 'payor' under the Payor

10  Contract."  Dkt. 91 at 11.  But according to the other parties in this litigation, including First

11  Choice, that is not a real conflict because WebTPA is clearly the "payor" under the Payor

12  Contract. *See* Dkt. 84 at 3-4; *see also* Dkt. 66 at ¶¶4.9, 4.17-4.34; Dkt. 44 at 4 ("WebTPA is a

13  Network Payor.").  Without expressing any opinion as to the merits of Northwest's claims, if the

14  Court does grant Northwest relief, there is no reason that relief cannot be complete among the

15  existing parties.

16  *b.  Any interest the Tribe has in this litigation is not "legally protected."*

17  Under the second prong of the Rule 19(a) analysis, WebTPA contends the Tribe has

18  multiple legally protected interests in the subject matter of this litigation, and that those interests

19  are threatened in "four concrete ways."  Dkt. 77 at 6-7.  The Court will address each of these

20  arguments in turn.

21  **1.    Financial Obligations**

22  WebTPA first argues the Tribe's "legally protected financial obligations under the Tribal

23  Plan" are put at risk by this action.  Dkt. 77 at 9.  But this is a misnomer: absentee parties'

24  strictly financial interests are not "legally protected" under Rule 19.  *Disabled Rights Action*

1    *Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 883 (9th Cir. 2004) (although absent party stood

2    "to lose a valuable source of income," its interest was not legally protected because "a financial

3    stake in the outcome of the litigation is not a legally protected interest" under Rule 19); *see also*

4    *Makah Indian Tribe*, 910 F.2d at 558 (to be legally protected under Rule 19 an absent party's

5    "interest must be more than a financial stake" in the litigation); *Dine Citizens Against Ruining*

6    *Our Env't v. Bureau of Indian Affs.*, 932 F.3d 843, 852 (9th Cir. 2019) ("To satisfy Rule 19, an

7    interest must be legally protected and must be 'more than a financial stake.'") (citation omitted);

8    4 Moore's Federal Practice – Civil § 19.03 (2022) (an interest under Rule 19 "must be 'legally

9    protected, not merely a financial interest or interest of convenience.'") (citations omitted).

10       Neither of the two cases WebTPA relies on here lend credibility to this argument.  The

11   litigation in *Takeda v. Nw. Nat'l Life Ins. Co.* involved a challenge to denial of benefits under an

12   employer health plan.  765 F.2d 815, 817 (9th Cir. 1985).  The two plaintiffs, a chiropractor and

13   his patient, alleged the third-party administrator ("TPA") tasked with "handl[ing] certain

14   administrative responsibilities under [the patient's employer's health] plan" was systematically

15   underpaying claims and "using improper bases for determining the allowance of claims."  *Id.*

16   The contract at issue was the health plan itself and the employer (also the plan sponsor) had

17   already joined the litigation as a counterclaimant alongside the TPA.  *Id.*  The issue for the court

18   to decide was whether the employer was required to be joined *as a defendant* under Rule 19, and

19   if so, whether the employer was indispensable.  *Id.* at 819.  The TPA objected to the employer's

20   joinder.  *Id.* at 817.

21       The court relied on facts differing from the facts here to determine the employer was

22   indispensable as a defendant.  First, the court noted there was a possibility that complete relief

23   may be unavailable if the employer was not joined, as it was unclear which entity—the employer

24

1   or the TPA—was responsible for the decisions about which plaintiffs complained.  *Id.* at 820-21.

2   Second, the court felt there was a risk that in any future litigation, the employer "could be

3   collaterally estopped from relitigating issues decided against [the TPA] in this proceeding" if it

4   did not participate as a defendant.  *Id.* at 821.  Finally, given that the case could continue in state

5   court if the employer's joinder destroyed diversity, "the availability of an alternative forum

6   weigh[ed] strongly in favor of remand."  *Id.* at 821.

7       In *LDFS LLC v. IEC Grp. Inc.*, a dialysis provider sued a TPA that it claimed failed to

8   pay the provider for certain services.  No. CV-17-08046-PCT-JJT, 2017 WL 3215556, at *1 (D.

9   Ariz. July 28, 2017).  The claims were for breach of contract for "failure to pay the full amount

10  of bills under the pricing agreement" and for "damages arising from two bounced checks sent by

11  the TPA to the plaintiff that bounced."  *Id.*  Again, the court determined the health plan was a

12  required party under Rule 19 based on facts very different from the facts in this litigation.  First,

13  the health plan was provided by a non-profit healthcare corporation owned by the Navajo Nation

14  ("Healthcare Corporation").  *Id.*  Eligibility for coverage of benefit claims was solely determined

15  by the Healthcare Corporation, not the TPA.  *Id.* at *2 ("The evidence shows that [the Healthcare

16  Corporation], not [the defendant TPA], determines what payments will be made.").  Moreover,

17  the pricing agreement between the dialysis provider and the TPA expressly stated it "[did] not

18  constitute a guarantee of benefits."  *Id.*  Although their pricing agreement was relevant to

19  determining the amount to be paid for *covered claims*, the question of coverage was decided by

20  the Healthcare Corporation.  *Id.*  And, as the owner of the account from which the bounced

21  checks were written, the Healthcare Corporation was required for resolving that dispute as well.

22  *Id.*  Under these facts, the court concluded the Healthcare Corporation was indispensable to the

23  litigation.

24

1    As Northwest points out, neither of these cases "even speak to the issue here, where the

2    suit is ***not*** for plan benefits."  Dkt. 84 at 25 (emphasis in original).  WebTPA argues the court in

3    *Takeda* found the plan sponsor a required party "because, under the agreement between the

4    sponsor and third-party administrator, the sponsor had 'the final responsibility and liability for

5    payment of claims in accordance with the provisions of the Plan' and agreed to indemnify the

6    administrator."  Dkt. 77 at 7.  But this is a vast simplification of the court's reasoning in that

7    case.  The court's primary concern relating to the employer's ultimate responsibility for making

8    coverage and payment determinations was not that it had a legally protected interest in litigating

9    those issues, but that complete relief may be unavailable to the plaintiffs if the employer was not

10   joined as a defendant.  *Takeda*, 765 F.2d at 820-21.  As discussed *supra*, that is not a concern in

11   this case.  Nor does WebTPA's explanation of how the Tribe faces a risk of collateral estoppel

12   here—a factor that weighed heavily in the *Takeda* court's decision—hold water.  Dkt. 91 at 3-4.

13   The notion that Northwest may at some later point sue the Tribe for unspecified claims, in the

14   absence of contractual privity, is too far-fetched to support WebTPA's argument.

15       WebTPA's arguments based on *LDFS*—an unpublished case from the District of

16   Arizona—are likewise inflated.  Again, the claims in *LDFS* were based, at least in part, on

17   adverse claim coverage determinations not at issue here.  *See, e.g.,* 2017 WL 3215556, at *1

18   (TPA "has not paid for certain services").  In addition, the Healthcare Corporation had "the final

19   discretionary authority to determine what benefits will be paid by the [health plan]."  *Id.*  And

20   finally, WebTPA ignores the fact that the pricing agreement in *LDFS* specifically denounced any

21   guarantee of benefits to the plaintiff.  *Id.* at *2.  Contrary to WebTPA's conjecture, there is no

22   rule that "a party . . . who has 'ultimate responsibility' for paying medical benefits is a necessary

23

24

1   party to a breach of contract action involving those medical benefits." Dkt. 77 at 7. The Court

2   should find the Tribe has not claimed a legally protected financial interest in this litigation.

3       **2.       Interpretation of the Plan**

4       Next, WebTPA alleges Northwest "challenges the proper interpretation and

5   administration of the Tribal Plan—another matter on which the Tribe . . . has a strong interest."

6   Dkt. 77 at 8. But this argument is premised on one sentence in the ninth cause of action in the

7   second amended complaint, which Northwest convincingly argues was erroneously written. *See*

8   Dkt. 84 at 27. The relevant portion of the sentence reads: "WebTPA's decision to reimburse

9   Northwest at Medicare Like Rates rather than the Network Rates was based on an *erroneous*

10  *interpretation* of Patient X's health plan instead of *reliance on* the First choice Network

11  contracts." Dkt. 66 at ¶13.9 (emphasis added). According to Northwest, however, its claim for

12  negligence is not based on an allegation that WebTPA wrongly interpreted the Plan. Dkt. 84 at

13  27. Rather, the negligence claim stems from Northwest's argument that "WebTPA did not use

14  reasonable care in determining to pay Northwest [Medicare-like rates]" instead of the Network

15  Rates outlined in the Provider Agreement, and "did not use reasonable care in determining the

16  factual predicate and legal requirements for application of [Medicare-like rates] *under federal*

17  *law*." Dkt. 84 at 27 (emphasis in original).

18      The Court is convinced by Northwest's argument that the allegation was intended to read

19  "an erroneous *reliance on*," rather than "an erroneous *interpretation of*," the Plan. Dkt. 84 at 27-

20  28. Northwest does not put the Plan at issue elsewhere in its complaint, and read in context,

21  Northwest's argument about the errant phrasing is logical. Moreover, WebTPA's allegation here

22  is counterfactual to Northwest's repeated insistence throughout this litigation that it is *not* suing

23  for benefits and is not challenging interpretation of the Plan. *See, e.g.,* Dkt. 66 at ¶1.6

24

1   ("Northwest is <u>not</u> suing in this action under ERISA to recover benefits under [the Plan], but

2   solely based on the independent contractual and other legal duties owed by the Defendants. . . .

3   As such, this action is <u>not</u> about Northwest's **right to** payment under [the Plan], but solely the

4   **rate of** payment at which it should have been reimbursed.") (emphasis in original).

5           Northwest states that if granted leave to do so, it will amend its complaint to correct the

6   erroneous phrasing in ¶13.9.  "The court should freely give leave [to amend] when justice so

7   requires."  Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the

8   underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he

9   ought to be afforded an opportunity to test his claim on the merits.").  Allowing Northwest to

10  amend here will clarify the issues and ultimately promote justice for both parties by preventing

11  undue delay in resolving this matter.  Furthermore, WebTPA's arguments against allowing

12  Northwest to amend are unconvincing, and the cases relied upon inapt.[1]  *See* Dkt. 91 at 5-6.  To

13  alleviate any confusion or concerns about whether Northwest is challenging interpretation of the

14  Plan, Northwest should be permitted to amend its second amended complaint for the limited

15  purpose of changing the last sentence of ¶13.9 to read: "Upon information and belief, WebTPA's

16  decision to reimburse Northwest at Medicare Like Rates rather than the Network Rates was

17  based on an erroneous reliance on Patient X's healthcare plan instead of reliance on the First

18  Choice Network contracts, which governed the rate that WebTPA was required to reimburse

19  Northwest at."

20          / / /

21  ───────────────────

22  [1] In *Goodwyn v. Wallop*, the court denied amendment because the plaintiff's amended complaint proposed
    essentially the same causes of action, and thus any amendment was futile.  No. 09-CV-00070-WDM, 2010 WL

23  11493941, at *5 (D. Wyo. May 19, 2010).  Similarly, in *Lewis v. Gov't of D.C.*, the plaintiff's attempt to exclude the
    U.S. Attorney as a required party was futile where the issue related to constitutional obligations under the Fourth

24  Amendment.  *Lewis v. Gov't of D.C.*, 324 F.R.D. 296, 305 (D.D.C. 2018).

### 3.    Payment for Services at Medicare-Like Rates

WebTPA next contends the Tribe has a legally protected interest "in paying reduced Medicare-like rates for services to its Plan participants under the Medicare Prescription Drug, Improvement and Modernization Act of 2003" ("Medicare Act") and that this litigation somehow threatens that interest. Dkt. 77 at 9. This argument is frivolous. Regardless of any interest the Tribe may have in paying lower rates for services to its Plan participants, the issue at bar is whether WebTPA and First Choice were contractually obligated to ensure Northwest was paid at Network Rates.

WebTPA asserts the Tribe has a right under Section 506 the Medicare Act "to access Medicare-like rates so long as certain conditions are satisfied," and that the Plan "requires reimbursement at Medicare-like rates where applicable." Dkt. 77 at 9. But Section 506 of the Medicare Act "only applies to hospitals treating inpatients," and specifically does not apply to "services of a Renal Dialysis Facility." Dkt. 84 at 9. WebTPA does not go so far as to allege that the conditions enumerated in the Medicare Act were met by Northwest's treatment of Patient X, nor that Medicare-like rates were applicable to the claims submitted by Northwest. Moreover, laying this argument to rest is the dispositive admission WebTPA made in discovery "that Section 506 of the [Medicare Act] does not apply to Northwest, an outpatient dialysis clinic." Dkt. 84 at 9 (citing Dkt. 86-6 (WebTPA's Third Supplemental Responses to Requests for Admissions at Request No. 60) (admitting that "as an outpatient dialysis clinic, Northwest was not required under 42 C.F.R. 136 to accept payment at Medicare-like rates for its treatment of Patient X in order to participate in Medicare.").

Finally, as Northwest points out, "common sense dictates that every person potentially impacted by the interpretation of a statute does not become an indispensable party to every case

1    where a court may be called upon to interpret that statute." Dkt. 84 at 28-29 (citing *Northrop*

2    *Corp.*, 705 F.2d at 1046). Any interest the Tribe may have in interpreting Section 506 of the

3    Medicare Act is no different from the interest any other tribe would hold. Such interest does not

4    constitute a legally protected interest for Rule 19 purposes.

5        **4.**    **Indemnification**

6        Finally, WebTPA contends "resolution of this case will directly impact the Tribe's

7    interest in parallel litigation with WebTPA over indemnification for Northwest's claims."

8    Dkt.77 at 10. But both common sense and case law dictate the Tribe's potential indemnification

9    of WebTPA is not a legally protected interest under Rule 19. Any interest the Tribe has in

10    making arguments against its purported obligation to indemnify WebTPA for the claims in this

11    case can be protected in separate litigation, as evidenced by the ongoing arbitration between the

12    Tribe and WebTPA. *See* Dkt. 77 at 10. WebTPA does not cite to, nor can the Court discern, any

13    case where an absent party that may be obliged to indemnify an existing party was found

14    indispensable under Rule 19 on that basis alone. *See Pasco Int'l (London) Ltd. v. Stenograph*

15    *Corp.*, 637 F.2d 496, 503 (7th Cir. 1980) ("[P]otential indemnitors have never been considered

16    indispensable parties, or even parties whose joinder is required if feasible."); *Bank of Am. Nat'l*

17    *Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 844 F.2d 1050, 1054 (3rd Cir. 1988) (holding

18    defendants' rights to contribution or indemnity from absent party does not render that absentee

19    indispensable); *see also Corbis Corp. v. Integrity Wealth Mgmt., Inc.*, 2009 WL 2486163, at *5

20    (W.D. Wash. 2009) ("While Defendant may have a separate third-party claim against [absent

21    party], this does not require [the absent party] to be joined in this lawsuit as a necessary party")

22    (citing *Bank of Am. Nat'l Trust & Sav. Ass'n*, 844 F.2d at 1054. Moreover, as discussed *supra*,

23    purely financial interests do not constitute legally protected interests under Rule 19.

24

1    WebTPA asserts that "Indian tribes are necessary parties to actions affecting their legal

2    interests." Dkt. 77 at 6 (quoting *Confederated Tribes of Chehalis Indian Reservation v. Lujan*,

3    928 F.2d 1496, 1499 (9th Cir. 1991)).  But that rule is meaningless here given WebTPA's failure

4    to carry its burden of showing the Tribe's claim to *any* legally protected interest in the subject

5    matter of this litigation.  As a practical matter, continuing this litigation without the Tribe will

6    neither impair nor impede its ability to protect any interests.  *See* Fed. R. Civ. P. 19(a)(1)(B).

7    Nor will the defendants be left subject to a "substantial risk of incurring double, multiple, or

8    otherwise inconsistent obligations." *See* Fed. R. Civ. P. 19(a)(1)(b)(ii).  While the Court

9    recognizes a separate action for indemnification may be a "less convenient remedy" for

10   WebTPA than either involving the Tribe in this litigation or dismissing it altogether, it is

11   nonetheless a "means of resolving [their] claim of the risk of inconsistent obligations." *Gardiner*

12   *v. Virgin Islands Water & Power Auth.*, 145 F.3d 635, 642 (3rd Cir. 1993) (explaining generally,

13   "a defendant's right to contribution or indemnity from an absent . . . party does not render that

14   absentee indispensable pursuant to Rule 19," and concluding such defendant "is free to pursue

15   any claim it has against [the absent party] in a separate action.").  The Court recommends finding

16   the Tribe is not a required party under Rule 19.

17      2.  Feasibility of Joinder

18      If the Tribe was a required party, the next step in the Rule 19 analysis would be to

19   determine the feasibility of ordering that it be joined.  *See* Fed. R. Civ. P. 19(b).  WebTPA

20   contends the Tribe's sovereign immunity protects it from unwilling joinder here.  Dkt. 77 at 11-

21   12; *see also* Dkt. 79 at ¶¶ 5, 7.  Northwest counters that joinder of the Tribe "is feasible,"

22   because "any involvement by the Tribe in this suit would be with respect to [the Plan]," which is

23   subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), and which

24   contains civil enforcement provisions.  Dkt. 84 at 29-30; *see also* Dkt. 26-3 (Plan).  By operating

a non-governmental health plan that incorporates ERISA, the Tribe has waived its sovereign immunity with respect to enforcement of that Plan. *Id.* (citations omitted); *see also Centre for Neuro Skills*, No. 1:13-CV-00734-LJO-JLT, 2013 WL 5670889, at *11 (E.D. Cal. Oct. 15, 2013) (court found medical provider could sue tribe directly because tribe waived sovereign immunity as to enforcement of health plan governed by ERISA).

Under the facts as plead by Northwest, the Court agrees the Plan is subject to ERISA. It may be, therefore, that the Tribe has waived its sovereign immunity from this suit insofar as its involvement would depend on analysis of the Plan. But those are not the facts before the Court. To properly perform this analysis, the Court would need to know the nature of the Tribe's involvement in the suit, not merely hypothesize what that nature might be. Northwest's claims do not arise under ERISA—they arise under common law principles of contract and quasi-contract law and of negligence. Without knowing more, the Court cannot decide conclusively whether the Tribe's sovereign immunity would prevent its joinder in this suit. Given the Court's recommendation that the Tribe is not a required party, however, it is not necessary to reach a conclusion on this question.

3. <u>Indispensability Analysis</u>

Where an absent party is required under Rule 19(a), but joinder of that party is infeasible, the court must consider under Rule 19(b) whether the case should proceed in that party's absence. *Deschutes River All. v. Portland Gen. Electric Co.*, 1 F.4th 1153, 1163 (9th Cir. 2021) ("Joinder of the Tribe is infeasible because of its sovereign immunity. We must therefore determine under Rule 19(b) whether the case can proceed in the Tribe's absence."). If the case should not proceed, a court will conclude the party is indispensable to the litigation and dismiss. In conducting this analysis, courts balance four equitable factors: (i) the extent to which a judgment rendered in required party's absence could prejudice either the absent party or the

1    existing parties; (ii) the ability of the court to reduce any prejudice by shaping the relief or using

2    other measures; (iii) whether any judgment rendered in the required party's absence "would be

3    adequate"; and (iv) whether the plaintiff will have an "adequate remedy" if the court decides the

4    action must be dismissed.  Fed. R. Civ. P. 19(b).

5         As WebTPA points out, in cases where a tribe is a required party and cannot be joined

6    because of sovereign immunity, a balancing of the equitable factors under Rule 19(b) usually

7    dictates dismissal.  Dkt. 12-13; *see also Deschutes River All.*, 1F.4th at 1163 (collecting cases).

8    But without finding the Tribe to be a required party, the Court is unable to conduct this analysis.

9    The Court does not know what the nature of the Tribe's legally protected interest would be in

10   such a scenario and would require more information.  Regardless, based on the Court's

11   recommended finding that the Tribe is not a required party, WebTPA's motion for judgment on

12   the pleadings should be denied.

13        4.  Motion Timing and Motive of the Movant

14        The Court cannot overlook the fact that WebTPA filed this motion a full *three years* after

15   litigation began.  Nor can the Court ignore abundant evidence—e.g., ongoing arbitration against

16   WebTPA over liability for Northwest's claims—that the Tribe is aware of this action, yet its only

17   expression of interest is in a declaration submitted in support of this motion.[2]  Moreover, that

18   declaration simply states the Tribe "has determined that the case could significantly impact [its]

19   legal rights and financial interests, specifically with regard to the operation of the Tribe's health

20   care program that provides medical services to the Tribe's citizens."  Dkt. 79 at 4.  The Tribe

21

22   [2] The Court finds unconvincing Northwest's argument that joinder of the Tribe is unnecessary given its right to control WebTPA's defense of this litigation per the terms of the ASA, and that the Tribe's failure to do so is

23   evidence of its lack of interest here.  Dkt. 84 at 18.  Presumably, the Tribe has avoided involvement in this litigation because it contends to not be liable for Northwest's claims in the separate arbitration against WebTPA.  If that is the case, taking control of WebTPA's defense of this action would undercut its position in arbitration, and is best

24   understood in that context.

gives no information beyond this statement about what those "legal rights" or "financial interests" might be, or how this litigation could impact the operation of its Plan, so the Court is left with the arguments made by WebTPA on the Tribe's behalf. *See Catlin Specialty Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. CV 13-7594 FMO, 2015 WL 12791423, at *6 (C.D. Cal. Sept. 30, 2015) (Absent parties that have not claimed an interest in the lawsuit "cannot be necessary parties under Rule 19(a)(1)(B).").

While an indispensability defense may be raised at any point in the litigation, it is equally true that courts may consider the timing of such a motion and the motive of the movant. *See, e.g., Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 896 (9th Cir. 1996) ("[T]he district court has discretion to consider the timeliness of [a Rule 12(b)(7) motion] if it appears that the defendant is interposing that motion for its own defensive purposes, rather than to protect the absent party's interests."); *see also Gil Enters., Inc. v. Delvy*, 79 F.3d 241, 247 (2d Cir. 1996) (citing the timing of plaintiff's indispensability argument under Rule 19 in denying its attempt to use that rule offensively); *Judwin Props., Inc. v. U.S. Fire Ins. Co.*, 973 F.2d 432, 434 (5th Cir. 1992) (same); *Arnold v. BLaST Intermediate Unit 17*, 843 F.2d 122, 125 n. 6 (3rd Cir. 1988) (moving party barred by equitable principle of laches from arguing for remand to district court so it could move for dismissal based on failure to join an indispensable party, where moving party failed to make the argument before the appeal stage despite ample opportunity); *Almont Ambulatory Surgery Center, LLC v. UnitedHealth Grp., Inc.*, CV 14-3053-MWF (AFMx), 2018 WL 11241771, at *5 (C.D. Cal. April 11, 2018) (after robust motions practice, including two motions to dismiss, in which no Rule 19 argument was ever raised, court suspected counter defendants raised the indispensability argument "now for their own defensive purposes"); *Woods v. Asset Res.*, No. CV 06-398-SMS, 2006 WL 3782704, at *14 (E.D. Cal. Dec. 21, 2006)

1   (denying a motion under 12(b)(7) without analysis where it appeared the defendant was

2   "interposing the motion for its own defensive purposes"); Fed. R. Civ. P. 19 advisory

3   committee's note to 1966 amendment ("[W]hen the moving party is seeking dismissal in order to

4   protect himself . . . and is not seeking vicariously to protect the absent person against a

5   prejudicial judgment . . . his undue delay in making the motion can properly be counted against

6   him as a reason for denying the motion."). The Rule 19 inquiry is intended to be practical and

7   fact specific, and "is designed to avoid the harsh results of rigid application." *Shermoen v. U.S.*,

8   982 F.2d 1312, 1317 (9th Cir. 1992). Where it appears a defendant is using the rule for improper

9   motives or to engage in gamesmanship, denial of the motion is appropriate. *Shropshire v.*

10  *Canning*, No. 10-CV-01941-LHK, 2012 WL 13658, at *6 (N.D. Cal. Jan 4, 2012) ("Defendant

11  appears to be using Rule 19 to engage in gamesmanship. The joinder rule was not designed for

12  such purposes, and abuse of the rule will not be condoned.").

13      In the three years since this litigation was filed, nothing factual has changed that would

14  make the Tribe any more indispensable as a party now as it might have been in 2019. WebTPA

15  could counter that its argument about Northwest putting interpretation of the Plan at issue only

16  arose seven months before it filed the present motion, when Northwest filed its second amended

17  complaint. But that argument was just one basis on which WebTPA predicated its motion, and

18  was hardly plausible. Meanwhile, WebTPA has had ample opportunity throughout this litigation

19  to argue for the Tribe's indispensability in any dispositive motion, including its motion to

20  dismiss filed in December 2019. *See* Dkt. 25.

21      Moreover, WebTPA's expression of concern for the Tribe's interests strike the Court as

22  questionable. WebTPA is actively engaged in arbitration to foist liability for Northwest's claims

23  on the Tribe. Nevertheless, the only expression of concern the Tribe has made in this litigation is

24

unconvincing: its declaration sparsely states the legal conclusion that the Tribe's interests are at stake here, but gives no explanation of what those interests are or why this litigation is a threat to them. *See* Dkt. 79. As discussed *supra*, WebTPA's more specific arguments about the Tribe's alleged interests are either unsupported by the law or depend upon allegations that controvert the facts as pleaded by Northwest. *See Carr v. United Healthcare Servs., Inc.*, C15-1105-MJP, 2016 WL 7716060, at *3 (W.D. Wash. May 31, 2016) ("The problem with Defendant's motion is that it relies on factual allegations that controvert Plaintiff's allegations," but "a 12(c) motion to dismiss is not the vehicle by which to raise factual allegations to defeat a claim."). Under these circumstances, WebTPA's motion appears potentially motivated by an improper desire to use Rule 19 defensively to escape liability. Given the undersigned's recommendation that the Court find the Tribe is not a required party, however, it is unnecessary to determine whether it should use its equitable powers to deny WebTPA's motion on the basis of gamesmanship.

## C. Motion to Strike

In its sur-reply, Dkt. 93, Northwest brings a motion "to strike a series of false, misleading, and improper arguments in Defendant WebTPA's Reply" brief. Dkt. 93 at 1. The Court will address Northwest's four arguments in turn.

First, Northwest contends the Tribe has the contractual right under the ASA to control WebTPA's defense in this litigation, and therefore from a practical standpoint can fully protect any interest it may have without being joined. Dkt. 93 at 1-2. In response, WebTPA argues this point is "irrelevant" under the circumstances, where the Tribe disputes liability for Northwest's claims and the parties are "engaged in arbitration over whether the ASA's indemnification provision covers" those claims. Dkt. 91 at 10.

As discussed *supra* at footnote 2, the Court is unconvinced by Northwest's argument here. As Northwest points out, the Tribe does appear to have the contractual right to control

1    WebTPA's defense in this litigation per the terms of the ASA if it so chooses.  *See* Dkt. 26-2 at

2    ¶1.6.  But Northwest's argument ignores the practical effect such a move would have on the

3    Tribe's interests in arbitration against WebTPA.  According to WebTPA, the Tribe disputes any

4    liability for Northwest's claims.  Controlling WebTPA's defense here would undercut that

5    argument.  The Court should deny this portion of Northwest's motion and not strike the

6    arguments WebTPA makes on this issue.

7         Second, Northwest argues WebTPA "takes pains to falsely represent both Northwest's

8    argument regarding [*Takeda* and *LDFS*] and the facts of those cases found by the respective

9    courts."  Dkt. 93 at 2-3.  The Court agrees with Northwest that in its reply brief, WebTPA

10   mischaracterizes Northwest's argument for distinguishing *Takeda* and *LDFS*.  *See* Dkt. 93 at 2-3;

11   Dkt. 91 at 2-3; Dkt. 84 at 24-27.  WebTPA asserts Northwest tried "to dismiss *Takeda* and *LDFS*

12   as involving only 'plan benefits' <u>under ERISA</u>," Dkt. 91 at 2-3 (emphasis added), but that is

13   false: nowhere in its opposition did Northwest argue the plaintiff in either case was seeking plan

14   benefits under ERISA.

15        The Court also agrees WebTPA mischaracterized the facts in *LDFS* when it misleadingly

16   quoted an argument from the *LDFS* plaintiff's brief.  *See* Dkt. 91 at 3.  WebTPA stated, "[t]he

17   medical provider in *LDFS* alleged it was 'not seeking health benefits under the plan,' but was

18   'asserting direct, non-derivative claims that arise from the [TPA's] alleged failure to honor the

19   terms of a pricing agreement.'"  Dkt. 91 at 3 (quoting Pl.'s Mem. in Opp'n to Def.'s Mot. to

20   Dismiss, ECF No. 12 (May 23, 2017)).  But that argument was rejected by the court, which

21   treated the plaintiff's claims as seeking plan benefits.  *See LDFS*, 2017 WL 3215556.  The Court

22   should grant this portion of Northwest's motion and strike these arguments.

23

24

1    Third, Northwest asserts WebTPA "falsely represents" in its Reply brief that Northwest

2    admits its claims "will *necessarily require* interpretation of 'the rights and benefits contained in

3    the [Plan]." Dkt. 93 at 3. Northwest repeatedly refutes this conjecture throughout the briefing

4    for this motion and the provision WebTPA cites as supporting it, does not. In addition,

5    Northwest contends WebTPA impermissibly raised an argument relating to this assertion based

6    on the Payor Contract for the first time in its reply. Dkt. 93 at 3 (citing Dkt. 91 at 6). The Court

7    agrees this argument is new. Courts in the Ninth Circuit generally will not consider arguments

8    raised by the moving party for the first time in a reply brief and the Court should adhere to that

9    rule here in the interests of justice. *Coos Cnty. v. Kempthorne*, 531 F.3d 792, 812 n. 16 (9th Cir.

10   2008). For these reasons, the Court should grant this portion of Northwest's motion and strike

11   these two arguments.

12   Fourth, Northwest states WebTPA "falsely represents on multiple occasions that

13   'Northwest admits that the Tribe is a required party . . . unless its interests in the case are patently

14   frivolous." Dkt. 93 at 3 (citing Dkt. 91 at 4). The Court agrees again that this argument is

15   simply false: Northwest makes no such admission anywhere in its briefing. The Court should

16   grant this portion of Northwest's motion and strike this argument.

17   For the reasons given above, the undersigned has not herein considered the arguments

18   outlined in parts 2-4 of Northwest's motion to strike and recommends granting the motion as to

19   those arguments.

20   ## IV. CONCLUSION

21   For the reasons discussed herein, WebTPA's motion for judgment on the pleadings for

22   failure to join an indispensable party, joined by First Choice, should be DENIED. Northwest's

23   motion to strike should be GRANTED in part and DENIED in part.

24

### V. OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within fourteen (14) days of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **January 13, 2023**.

Dated this 28th day of December, 2022.

S. KATE VAUGHAN
United States Magistrate Judge